IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARIE SMITH AND ROBERT UNDERWOOD, on behalf of themselves and of others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>TRANSUNION RISK AND ALTERNATIVE DATA SOLUTIONS, INC., AND TRANSUNION LLC,<br><br>Defendants. | )<br>)<br>)<br>) 1:21-cv-06299<br>)<br>)<br>)<br>)<br>)<br>) JURY TRIAL DEMANDED<br>) |

## CLASS ACTION COMPLAINT

Plaintiffs Marie Smith, and Robert Underwood (hereinafter "Plaintiffs"), individually and on behalf of others similarly situated, bring this class action lawsuit against TransUnion LLC and TransUnion Risk and Alternative Data Solutions, Inc., (collectively referred to herein as "TransUnion-TRADS").

## I. INTRODUCTORY FACTS

1.      This is a consumer class action that arises from the sale or licensing[1] of consumer background data by TransUnion-TRADS to a group of people-search, background reporting websites (the "Background Websites"). These Background Websites sell highly personal data on American consumers to the general public, data which includes a person's address, phone number, financial records, professional license information, criminal records, date of birth and more. In

_____

[1] For purposes of this pleading, Plaintiffs will use the terms "sale" and "licensing" interchangeably, but note that Defendants' website states that data resellers, like the downstream clients in this case (i.e., the "Background Websites") purchase criminal data from Defendants via a licensing agreement and even attach a generic sample one for review at the following link:  https://www.tloxp.com/terms-conditions

1

Plaintiffs' case, this data improperly included expunged criminal records that were, in turn, published and sold by the Background Websites—and almost certainly by a number of Defendants' other clients—to the general public in violation of the following laws:

- The Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq. (the "FCRA");

- The Texas Expungement Removal Act, Tex. Bus. & Comm. and Code §§ 109.001–.007;

- The Texas Deceptive Trade Practices Act (the "DTPA"), §17.41 of the Tex. Bus. & Comm. Code; and,

- Title V of the Graham-Leach-Bliley Act (the "GLBA").

2.      Determining the identity of other people-search, background reporting websites (i.e., Defendants' other clients or licensees), or any category of Defendants' other clients, who also purchased and published Plaintiffs' expunged records is critical both in ascertaining the scope of Defendants' misconduct and in permanently removing these records from the public domain.

3.      Plaintiffs in this case come from a group of Texas-based, former subscribers of an online expungement assistance service, whose expunged or sealed records still appeared for sale on the Background Websites anywhere from one to two years after notices were provided demanding their immediate removal.  In each case, the notice provided included a court order of removal from a Texas judge, which was not followed.

4.      Having licensed and sold these expunged records, TransUnion-TRADS knew or should have known that violations by its licensees/clients were occurring and intervened to end the injurious conduct pursuant to Defendants' rights and duties as licensors and vendors to do so. The evidence will show that Defendants received legal notice to remove Plaintiffs' expunged records (1) from Plaintiffs or Plaintiffs' expungement service provider, (2) from state criminal records services, and/or (3) from their own licensees and clients yet did nothing.

2

5.      Especially in light of the length and breadth of the misconduct detailed above, Defendants' problems are potentially criminal in nature, as well.  In Texas, by way of example, the knowing publication of expunged records for a profit is a second-degree felony (Texas Government Code § 411.085), triggers $1,000 per violation in civil penalties (Texas Government Code § 552.1425), and may result in a year-long ban from receiving criminal record data from the State (Texas Government Code § 411.0835).

6.      Accordingly, Plaintiffs bring this action on behalf of all Texas consumers, and all consumers of other states, who had their expunged or sealed records sold and/or licensed by TransUnion-TRADS.  Upon ascertaining the states of residence for such consumers, this Complaint will be amended to add applicable consumer protection and expungement laws existing in these other jurisdictions, as well.

## II.    JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction under 15 U.S.C. § 1681p, which allows any FCRA claim to "be brought in any appropriate United States district court, without regard to the amount in controversy.…" Plaintiffs are bringing claims under the FCRA in this case.

8.      This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331, which gives federal district courts original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. Plaintiffs are bringing claims under the FCRA in this case.

9.      This Court also has subject-matter jurisdiction under 28 U.S.C. § 1367 for supplemental state-law claims.  Plaintiffs also are bringing supplemental Texas statutory claims under TEX. BUS. & COM. CODE ANN. §§ 109.001–.007 and the Texas DTPA.

10.      This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332(a) as there is complete diversity between the parties and the matter in controversy is more than $75,000.

3

11.     This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2) because this is a class action case where the matter in controversy, exclusive of interest and costs, exceeds $5 million and a member of a class of plaintiffs is a citizen of a state different from any defendant.

12.     Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b) some Plaintiffs are from the Southern District of Texas.

13.     This Court has personal jurisdiction over Defendants because each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States and Texas, including in this District. The scheme and conspiracy have been directed at, and has had the intended effect of, causing injury to persons and local governments residing in, located in, or doing business throughout the United States and Texas, including in this District. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Texas.

### III.    PARTIES

14.     Plaintiff Marie Smith is an adult individual and citizen of the State of Texas who resides in San Antonio, Texas.

15.     Plaintiff Robert Underwood is an adult individual and citizen of the State of Texas who resides in Burleson, Texas.

16.     Defendant TransUnion Risk and Alternative Data Solutions, Inc., is a Delaware corporation with its principal place of business in Boca Raton, Florida.  Defendant licenses and/or sells consumer data to background screening services and operates as a consumer reporting

4

agency. Defendant regularly conducts business in the State of Texas, and it operates a principal place of business at 4530 Conference Way South, Boca Raton, Florida 33431.

17.     Defendant Trans Union LLC is a Delaware corporation with its principal place of business in Chicago, Illinois.  Defendant is a credit reporting agency and also operates as a consumer reporting agency. Defendant regularly conduct business in the State of Texas, and it operates a principal place of business at 555 West Adams, Chicago, Illinois 60661.

## IV.     BACKGROUND

### A.     *The Need for Consumer Protection.*

18.     In addition to harming Plaintiffs, TransUnion-TRADS' misconduct completely undermines the efforts of legislatures in all 50 states.  About one in three Americans has a criminal record of some kind; moreover, 87 percent of employers, 80 percent of landlords, and 66 percent of colleges screen for criminal records.  In today's digital age, background checking—especially as relates to mistakes a person made earlier in life—has become an intractable barrier to employment, credit, insurance and housing for huge numbers of people with criminal records.  The collateral consequences of these barriers harm not only the subject of the search, but his or her dependents and community as well, and have become a significant cause of poverty and hardship in this country.

19.     To alleviate this burden, nearly all 50 states have expanded their expungement or sealing laws in the last decade.  For instance, Texas passed its own protective provisions in 2013, which is today codified in Texas Business and Commerce Code §§ 109.001–.007.  These state laws provide additional remedies and protections to those found in the federal Fair Credit Reporting Act (15 U.S.C. § 1681 et seq), which has long forbidden the publication and reporting of expunged or sealed records.  Despite the efforts of Congress and state legislatures, however, the

commercial screening industry's continued publication and reporting of expunged cases threatens to undermine the whole strategy of broadening expungement as a remedy for the harm of collateral consequences.

20.    However, the proliferation of background check companies, numbering in the hundreds and all charging subscription or access fees, creates insurmountable logistical and financial obstacles to anyone wanting to insure his or her expunged criminal record was, in fact, removed by the universe of online businesses operating in this field.  First, someone would need to locate every reporting site, which is practically impossible, and, second, pay to join every site and then negotiate the removal of any wrongful publication of expunged or sealed records found, on a site-by-site basis.  As a result of this "Wild West" situation in the background screening industry, expunged records can be, and are, available for anyone to view for months or even years while, simultaneously, remaining unknown and undiscoverable to the individuals reported upon. [2]

### B.    *The Experience of Representative Plaintiffs*

21.    Against this daunting background, for approximately $600 each, Plaintiffs all hired the same online expungement assistance service to guide them through the legal process in Texas. Plaintiffs also paid several hundred dollars in court costs, fees, and related expenses to successfully expunge their records and received an expungement order from various Texas courts.  Similarly, Plaintiffs all paid an additional $250 for their expungement service provider to notify the universe of background check companies and data sellers, including Defendants, that they must remove Plaintiffs' expunged records from their databases.

---

[2] These factors weigh heavily in favor of finding "unconscionability" under various state and federal consumer protection statutes, including the Texas Deceptive Trade Practices Act.

22.     Meanwhile, the Texas Department of Public Safety received Plaintiffs' expungement orders from the respective courts and eliminated the records from its database.  This is the same database that was provided to bulk purchasers, including the Defendants.  Texas DPS records show that the Defendants should have received proper notice from Texas DPS that Plaintiffs' relevant criminal records had been expunged.

C.      *TransUnion-TRADS' Clientele.*

23.     The websites that were caught selling Plaintiffs' expunged records are in a subcategory of background data resellers that demands heightened scrutiny and caution, in particular for a heavily regulated, national credit reporting agency and CRA like TransUnion-TRADS.  This is because the Background Websites disclaim that the FCRA applies to them at all.  These disclaimers appear throughout the websites' online content and are based on the premise that none of their subscribers are using these sites to screen consumers for employment, housing, loans or credit (i.e., activities which trigger the FCRA).  Consequently, the Background Websites do not attempt to provide the consumer protections required by the FCRA, such as notice, copies of reports, rights to challenge, etc.

24.     As TransUnion-TRADS were aware, the Background Websites disclaim that they provide accurate data on consumers in their site's Terms of Service.  Each site also includes criminal data for unrelated third parties who happen to have similar sounding names to the subject of a search in all consumer reports, which means that Plaintiffs' expunged criminal records did not just appear in reports run on them, specifically, but also in innumerable reports run on other consumers with similar names, as well.  In addition, anyone viewing Plaintiffs' background report might wrongly believe that extraneous third-party criminal records belonged to Plaintiffs.  It is

unlawful for a national credit bureau to participate and partner in such injurious publication practices.

25.     Defendants were also aware that their clients and licensees included disclaimers about expunged records in their Terms of Service, such as:

> "[T]he criminal record data that may be provided as part of the Company's Background Information Services may include records that have been expunged, sealed, or otherwise have become inaccessible to the public…"

Again, it is unlawful for a national credit bureau to participate and partner with businesses that publish expunged and sealed records with such frequency that disclaimers are needed in their customer Terms of Service.

**D.      *Meeting of the minds.***

26.     Despite the above, however, Defendants not only agreed to be data suppliers for the Background Websites but also became the *source* of the expunged records at issue.  TransUnion-TRADS licensed or sold sub-standard data packages or databases to clients who claim to be exempt from regulation.  These data packages or databases were littered with expunged and/or sealed criminal records.  Defendants understood that regulators could not enforce expungement orders, absent FCRA liability for the websites involved, and that private party litigation was unlikely unless, as finally happened here, a large enough group of aggrieved consumers were able to band together and sue.   Beyond just expungements, however, Defendants also deprived and concealed from Plaintiffs their right to FCRA consumer privacy protections and their right to Notice and Opt-Out under the GLBA.

**E.      *The Intersection of Statutory Law in this Case***

27.     There is no single federal law that governs all uses or disclosures of consumer information.  Rather, specific statutes and regulations may restrict disclosure of consumer information in certain contexts and require entities that maintain this information to take reasonable steps to ensure the security and integrity of that data.  The legal and regulatory regime controlling America's background reporting industry is comprised of three federal statutes, which all come into play here:  Title V of the GLBA, the Fair Credit Reporting Act ("FCRA"), and Section 5 of the Federal Trade Commission Act, which is really a Federal Deceptive Trade Practices Act ("Federal DTPA").  Regulatory authority over the FRCA and GLBA exists across numerous federal agencies, including the Federal Trade Commission ("FTC") and the Financial Consumer Protection Bureau ("FCP Bureau").  Enforcement of the Federal DTPA lies solely with the FTC.  In addition, while this federal regulatory regime is augmented in various ways by state consumer protection laws, the most common feature is creating private party claims under state deceptive trade practices acts that basically track the Federal DTPA.

28.     As is the case for state-level consumer protections statutes nationwide, the Texas DTPA was modeled on the Federal DTPA.[3]  Not only do the provisions of these acts track closely to one another, but the Texas DTPA expressly states that its provisions "apply to any act or practice prohibited" by the FTC in enforcing the Federal DTPA.  *See* Texas Bus. & Comm. Code. Ann. § 17.49(b).

**F.      *Selling Expunged Records is both "Deceptive" and "Unfair"***

---

[3] *See* "A 50-State Report on Unfair and Deceptive Acts and Practices Statutes," Carolyn L. Carter, (National Consumer Law Center, Inc., Publisher, February 2009) p. 6.

29.     Past actions of the FTC in enforcing the Federal DTPA are a useful guidepost in applying the concepts of "deceptive" and "unfair" practices to this case.  In 2012, the Federal Trade Commission fined a consumer background reporting company $2.6 million for publishing and selling expunged criminal records.  *See U.S. v. HireRight Solutions, Inc.,* Consent Decree 102-303 (D.D.C.) (August 8, 2023).[4]  In that case, the FTC successfully charged Defendant HireRight Solutions with committing both deceptive and unfair practices by engaging in nearly identical misconduct as the TransUnion-TRADS here:

> "Defendant … failed to follow reasonable procedures to assure that the information contained in consumer reports it furnished reflected the current public record status of consumers' information, **such as expungement of a criminal record**."[5] (Emphasis added).

Per *HireRight Solutions, Inc*., selling inaccurate consumer reports—and, specifically, reports containing expunged records—"constitute[s] unfair or deceptive acts or practices in violation of section 5(a) of the FTC Act, 15 U.S.C. § 45(a)," (the Federal DTPA).  Selling expunged records, according to the Order, also violated the FCRA's requirement that background reporting companies take reasonable steps to ensure maximum possible accuracy in the data they sell.

## G.     *The FCRA:  Defendants are Consumer Reporting Agencies*

30.     There should be no dispute in this case that TransUnion-TRADS are consumer reporting agencies under the FCRA.  Neither disclaims this fact and TransUnion-TRADS has been deemed as such for decades by the landmark decision *Trans Union v. FTC,* 295 F.3d 42, 49-51

---

[4]  The U.S. District Court's Consent Decree may be viewed here:
https://www.ftc.gov/sites/default/files/documents/cases/2012/08/120808hirerightstip.pdf

[5]  The FTC's Complaint may be viewed here:
https://www.ftc.gov/sites/default/files/documents/cases/2012/08/120808hirerightcmpt.pdf

(D.C. Cir. 2002). Selling expunged records to non-FCRA complaint data resellers violates multiple sections of that statute.

31.    Despite their FCRA duties to maintain strict procedures to assure that criminal record information is complete and up to date, and to utilize procedures designed to assure maximum possible accuracy of the criminal record information that they publish and/or sell to the public, Defendants have nonetheless deliberately, willfully, intentionally, recklessly and negligently adopted a policy and practice that disregards these duties, in violation of the FCRA.

**H.    *The GLBA*: *Defendants Failed to Provide Notice or Opt-Out***

32.    It is settled law and practice for the FTC to premise Federal DTPA violations upon a company's failure to afford consumers their GLBA Privacy Rule rights. *See In the Matter of PayPal, Inc.,* Docket No. C-4651, (Federal Trade Commission Decision and Order, May 23, 2018).[6] Plaintiffs here, likewise, premise their Texas DTPA claims, in part, on Defendants' failure to afford them the same statutory rights. This is expressly allowed under § 17.49(b) of the Texas DTPA and Texas case law.[7]

33.    Because TransUnion-TRADS' clients, the Background Websites, are purportedly not governed by the FCRA, Title V of the GLBA ("the Privacy Rule") required Defendants to provide statutory notice and opt-out rights to Plaintiffs, which did not occur. As an initial matter, it is notable that TransUnion-TRADS were selling Plaintiffs' private banking data through the

---

[6]   The FTC Decision may be read here: https://www.ftc.gov/system/files/documents/cases/1623102-c4651_paypal_venmo_decision_and_order_final_5-24-18.pdf

The FTC Complaint may be read here: https://www.ftc.gov/system/files/documents/cases/1623102_c-4651_paypal_venmo_complaint_final.pdf

[7] That the GLBA itself contains no private right of action is irrelevant to whether its breach constitutes a violation of the Texas DTPA. See *Texas Cookie Co. v. Hendricks & Peralta, Inc.*, 747 S.W.2d 873, 877 (Tex. App.—Corpus Christi 1988, writ denied) (holding that a violation of a federal statute requiring notice was an actionable basis for finding an independent violation of the Texas DTPA, even though the federal statute contained no private right of action).

Background Websites to unvetted members of the general public. Known as "credit header" information, this banking data included identifying records about individual bank customers, such as Plaintiffs, that covered everything from name, birthdate, address, and social security number to details about bank accounts and loans. *All* of this credit header information—even the names and birthdates—is considered "Non-Public Information" (NPI) under the law due to how and why it was acquired by the banks. *See Trans Union v. FTC,* 295 F.3d 42, 49-51 (D.C. Cir. 2002). TransUnion-TRADS further admitted that almost all of its database is built off of accounts receivable tapes from banks, thus establishing that everything it sells to data brokers is NPI. *See, Id.; see also, Individual Reference Services Group, Inc. v. FTC*, 145 F. Supp.2d 6 (D. D.C. 2001).

34.     This is an outrageous situation. On the one hand, credit bureaus and FCRA-compliant data brokers honor regulations creating consumer transparency and privacy rights, thus protecting information banks acquire from ordinary citizens who open accounts and apply for loans. These operators follow the "permissible purposes" set forth in the FCRA which allow CRAs to provide consumer reports to their customers who have *a legitimate business need* for the information to evaluate a consumer who has applied to the report user for credit, employment, insurance, or an apartment rental. *See* 15 U.S.C. § 1681b(a)(3).

35.     Yet, here, the Defendants have been turning the exact same private, protected credit header information over to people-search websites, who then sell it to the *general public* without even knowing whether subscribers have a legitimate need for consumers' private credit header information.

36.    The GLBA's Privacy Rule requires any "financial institution,"[8] including any downstream reseller of data from such financial institution,[9] to afford consumers statutory Notice and Opt-Out rights whenever their credit header (NPI) information is sold to non-affiliated third parties (i.e., businesses, governments, and the general public), unless certain statutory exceptions are met.

37.    An exception to selling credit header (NPI) information without giving a consumer Notice or Opt-Out rights is if a background reporting company operates as a CRA (i.e., operates in compliance with the FCRA).[10]  This makes sense because in such cases the FCRA-compliant website will ultimately be supplying the consumer the full range of FCRA privacy protections.  In other words, there is no reason to burden a data reseller with supplying duplicative Notice and Opt-Out under the GLBA, when the FCRA has it covered.

38.    Who cannot acquire and sell credit-header data without complying with GLBA's Privacy Rule, however, are resellers that expressly disavow being CRA's, like the Background Websites.  Thus, there is no exception that pertains to them; to the contrary, in creating an exception for CRA's only, Congress intended non-FCRA compliant data brokers to comply with the GLBA Privacy Rule. There was no attempt to do so by Defendants or their clients in this case.

---

[8] The big three credit reporting agencies are "financial institutions" under the GLBA. *See Trans Union,* 295 F.3d 42, 48-49 (holding that a credit reporting agency "comes within GLBA's definition of "financial institution")

[9] *See* GLBA Sec. 502(c)("a nonaffiliated third party that receives from a financial institution nonpublic personal information under this section shall not, directly or through an affiliate of such receiving third party, disclose such information to any other person that is a nonaffiliated third party of both the financial institution and such receiving third party, **unless such disclosure would be lawful if made directly to such other person by the financial institution."**) (emphasis added)

[10] GLBA Sec. 502(e)(6) waives Notice and Opt-Out when credit header information is both sold "to a consumer reporting agency in accordance with the Fair Credit Reporting Act" and then when the FCRA-compliant website generates "a consumer report" for sale to its subscriber.

I.     **TEXAS EXPUNGEMENT STATUTE:** *Defendants Published and/or Conspired to Publish Criminal Records Under Texas Law.*

39.     Based on the same facts that triggered the FCRA/GLBA compliance requirements above, TransUnion-TRADS also fall squarely within the ambit of Chapter 109 of the Texas Business and Commerce Code (the "Texas Expungement Statute").

40.      In Texas, when an order of expunction is final, "the release, maintenance, dissemination, or use of the expunged records for any purpose is prohibited," and "the person arrested may deny the occurrence of the arrest and the existence of the expunction order." Tex. Code Crim. Proc. art. 55.03. Similar provisions exist in Texas for sealed criminal records, as well. Tex. Gov. Code §411.0755. Texas refuses to sell criminal record data to background reporting companies or credit reporting agencies who publish expunged or sealed records. Tex. Gov. Code §411.0835) Recognizing the seriousness of the harm such misconduct creates, the State of Texas specifically makes wrongful publication a second-degree felony. Tex. Gov. Code §411.085.

41.     As for private-party claims, Chapter 109 of the Texas Business and Commerce Code, the Texas Expungement Statute, governs business entities that are engaged in publication of certain criminal record information. Tex. Bus. & Comm. Code §§ 109.001–.007. Chapter 109 applies to a business entity or partnership that "publishes" criminal record information and that charges "a fee or other consideration to correct or modify criminal record information." Tex. Bus. & Comm. Code § 109.002(a)(1).

42.     Defendants sold and/or licensed Plaintiffs' criminal record information to third-party Background Websites, which satisfies both requirements of the Texas Expungement statute

14

since Defendants were obligated under statutory law to provide updates, corrections and modifications as part of their paid for package of services.[11]

43.     Defendants also made, or conspired to make, Plaintiffs' criminal record information available for inspection by anyone subscribing to these Background Websites; thus, again "publishing" such records under Texas law, which defines "publishing" very broadly, requiring only that a background investigation website or company "communicate or make information available to another person in writing or by means of telecommunications and includes communicating information on a computer bulletin board or similar system." Tex. Bus. & Comm. Code § 109.001(4).

44.     Without buying a subscription, consumers have no way of knowing whether their expunged records are being sold by Defendants and their partner Background Websites. Paying an automatically renewing subscription is a mandatory part of correcting or modifying a consumer's personal data and criminal record. Defendants and their co-conspirators, thus, charge "a fee or other consideration to correct or modify criminal record information" under Texas law. Moreover, the statutory language does not require that individual consumers be charged a fee or payment themselves, only that these are required generally by the website operators for anyone who wishes to correct or modify erroneous criminal records.

45.     This is an important distinction because the Background Websites' Terms of Service—which were drafted either by or in conjunction with Defendants—contain a trap that ironically also constitutes "other consideration" under the law. Before anyone may pay for and create an account, they must agree to waive any right to pursue a trial by jury or class action.

---

[11] Defendants may have been obligated to provide such updates, modifications and corrections under contract as well, but that is a matter that awaits discovery in this case.

Foregoing these valuable rights also constitutes a form of consideration that Plaintiffs *would have* been forced to part with had they subscribed to the websites themselves. The Texas Expungement Statute does not require a consumer to actually pay the consideration, only that a website seeks to charge or impose it.

46. Also, TransUnion-TRADS cannot claim they or their co-conspirators charge nothing for removing expunged data. Defendants and their Background Website partners received a multitude of court orders in a futile attempt to get Defendants to remove expunged records for free. If that had worked, Plaintiffs would not be here today, obviously. Instead, Plaintiffs and other expungement seekers like them have been forced into the expense and effort of litigation to enforce the court orders. Far from being cost or consideration free, getting Defendants and their co-conspirators to obey the law is expensive and exceedingly difficult.

47. Finally, a business entity may not publish criminal records if it has knowledge or has received notice that an order of expungement has been issued under Texas Code of Criminal Procedure article 55.03. Defendants received actual or constructive notice of the relevant expungement orders in this case or, alternatively, willfully turned a blind eye toward their existence. A business entity that publishes information in violation of section 109.005 is liable to the individual who is the subject of the information in an amount not to exceed $500 for each separate violation, and in the case of a continuing violation, an amount not to exceed $500 for each subsequent day on which the violation occurs. An individual who prevails in an action under section 109.005 is also entitled to recover court costs and reasonable attorney's fees. Tex. Bus. & Comm. Code § 109.005(d).

## V. CLASS ACTION ALLEGATIONS

48.     Pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of

Civil Procedure, Plaintiffs bring this action on behalf of themselves and "the Class," defined as:

> **All persons residing in the United States whose expunged or
> sealed records were licensed or sold by TransUnion-TRADS for
> eventual publication.**

49.     This Class is so numerous that joinder of all members is impracticable. Although

the precise number of Class members is known only to the Defendants, Plaintiffs aver upon

information and belief that the Class numbers in the thousands, at a minimum.  Through interstate

commerce, Defendants publish and sell standardized criminal history record information to

thousands of individuals and businesses throughout the country.

50.      There are questions of law and fact common to the Class that predominate over

any questions affecting only individual Class members. The principal questions include (a)

whether the Defendants, by employing a policy, scheme, and practice of publishing and disclosing

expunged criminal record histories, willfully and negligently violated FCRA section 1681e(b) by

failing to follow reasonable procedures to assure maximum possible accuracy of the information

concerning the individual about whom the report relates; (b) whether the Defendants violated

Chapter 109 of the Texas Business and Commerce Code for the same reasons; and (c) whether

Defendants violated the Texas DTPA for the same reasons and based upon unmet GLBA

obligations.

51.      Plaintiffs' claims are typical of the claims of each Class, which all arise from the

same operative facts and are based on the same legal theories.

52.      Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are

committed to vigorously litigating this matter. Plaintiffs have secured counsel experienced in

handling consumer class actions. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this claim.

53.     This action should be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members which would establish incompatible standards of conduct for the parties opposing the Class, as well as a risk of adjudications with respect to individual members which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

54.     A class action is a superior method for the fair and efficient adjudication of this controversy. The interest of Class members in individually controlling the prosecution of separate claims against Defendant is small as each cause of action is subject to a statutory damages cap and there is no reason to award different amounts per day among the Plaintiffs of those statutory damages that accrue daily.  Management of the Class claims is likely to present significantly fewer difficulties than those presented in many individual claims. The identities of the Class members may be obtained from the Defendants' records or those of their clients and co-conspirators, to which Defendants have access.

## VI.    CAUSES OF ACTION

## COUNT ONE – FCRA § 1681e(b)

55.     Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

56.     Pursuant to sections 1681n and 1681o, Defendants are liable for negligently and/or willfully violating the FCRA by failing to follow reasonable procedures to assure maximum

possible accuracy of the information concerning the individual about whom a consumer report relates, in violation of section 1681e(b).

57.     As a result of Defendants' conduct Plaintiffs suffered actual damages in the form of out-of-pocket loss in the funds paid to complete the expungement, expunction, or sealing of criminal records process only to have Defendants continue to report obsolete and impermissible criminal information about them. Plaintiffs likewise must pay their attorneys a significant percentage of damages on any recovery made in this case.

58.     Plaintiffs seek actual, statutory and punitive damages in addition to their costs and attorneys' fees pursuant to 15 U.S.C. §1681n.

**COUNT TWO – TEX. BUS. & COM. CODE §§ 109.001–.007**

59.     Plaintiffs incorporates the foregoing paragraphs as though the same were set forth at length herein.

60.     Pursuant to sections 109.001—.007, each of the Defendants are directly liable for failing to remove Plaintiffs' expunged criminal records and consumer reports from their own database and from being published or sold by their clients after being provided notice of expungement.

61.     Alternatively, Defendants are liable for conspiring to do the same.

62.     Plaintiffs are entitled to a penalty of up to $500 for each separate violation. Each of the Defendants have engaged, and are engaging, in a continuing violation, so a separate penalty of up to $500 per violation is owed for each day on which the violation occurred Tex. Bus. & Comm. Code § 109.005(b).

63.     Plaintiffs are entitled to their attorneys' fees and costs related to their claims for penalties under Texas Business and Commerce Code Chapter 109.  Tex. Bus. & Comm. Code § 109.005(d).

## COUNT THREE – TEXAS DTPA

64.     Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

65.     Defendants have violated the Texas Deceptive Trade Practices—Consumer Protection Act ("DTPA") as contained in Section 17.41 of the Tex. Bus. & Comm. Code, and Plaintiffs seek to recover treble damages, attorney's fees, and court costs under the DTPA.

66.     Plaintiffs were "consumers" under the DTPA. Plaintiffs purchased expungement services. These services form a basis of Plaintiffs' complaint and Defendants' misconduct occurred in connection with effectuating the expungement services.

67.     The conduct, as detailed in this Complaint, constituted "false, misleading, or deceptive" acts, practices, omissions and/or "unconscionable conduct." Each such act, practice, omission, and unconscionable conduct was a producing cause of economic damages and mental anguish damages for Plaintiffs.

68.     The Texas DTPA defines an "unconscionable action" as one that "takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree." *See* Definitions §17.45(5).  Defendants' sale of and failure to remove Plaintiffs' expunged records occurred without Plaintiffs knowing that Defendants and their clients were selling Plaintiffs' personal records, without Plaintiffs being able to view relevant reporting products, and without Plaintiffs knowing either how Defendants acquired their records or to whom they were sold.  Far from being an arm's-length relationship, Plaintiffs were completely in the dark and powerless to

stop what occurred, thus meeting the unconscionability standard of the Texas DTPA. Furthermore, for the reasons described earlier in this Complaint, Defendants' violations of the GLBA constitute "unconscionable" conduct under the Texas DTPA.

69.     Texas DTPA § 17.46(b) (colloquially known as the DTPA "laundry list") defines a "deceptive act or practice" to include the following actions that occurred in this case:

- Defendants caused confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

- Defendants represented that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not;

- Defendants represented that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

- Defendants represented that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

- Defendants failed to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

70.     Not only did Defendants' sale of Plaintiffs' expunged records, and subsequent failure to remove them from their clients' websites violate these "laundry list" provisions, but so too did their violations of the GLBA.

71.     Additionally, Defendants dictated significant portions of the language and content that appear on their clients' websites related to Defendants' data and database, insisted on contractual right of control over such language and content, and thoroughly reviewed the entirety of these websites before contracting and after. Defendants, thus, drafted, sponsored, adopted, promulgated and failed to correct deceptive statements that appeared on these websites.

72.     Finally, Defendants concealed and omitted consumers' rights under the GLBA from their explanations of other consumer rights and remedies that appeared in sections of their client's websites that Defendants drafted and controlled.

73.     As all the aforementioned misconduct was committed knowingly or intentionally, Plaintiffs are entitled to recover up to three times the amount of the aforementioned economic and mental anguish damages.

74.     Plaintiffs are also entitled to recover reasonable and necessary attorney's fees and court cost under the DTPA.

**COUNT FOUR – CONSPIRACY**

75.     Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.  In relation to violating the FCRA, the Texas Expungement Statute, and the Texas DTPA, the facts show: (1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occurred as a proximate result. *See, First United Pentecostal Church of Beaumont v. Parker,* 514 S.W.3d 214 (Tex. 2017).

76.     Plaintiffs are entitled to recover the same relief under their conspiracy claim as is described for the underlying statutory cause of action.

**COUNT FIVE - INJUNCTIVE RELIEF UNDER TEXAS LAW**

77.     Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

78.     Plaintiffs request that the Court enter a temporary and permanent injunction ordering Defendants to comply with Texas Business and Commerce Code Chapter 109 by (1)

immediately removing all information regarding any criminal record information related to Plaintiffs that has been expunged by a Texas court from their databases, and (2) not publishing any criminal record information that has been expunged by a Texas court.  Tex. Bus. & Comm. Code § 109.005(c) ("In an action brought under this section, the court may grant injunctive relief to prevent or restrain a violation of this section.").

79.     Plaintiffs are entitled to attorneys' fees and costs related to seeking and obtaining injunctive relief.  Tex. Bus. & Comm. Code § 109.005(d).

## VII.   JURY DEMAND

80.     Plaintiffs demand trial by jury on all issues so triable.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek relief against the Defendants as follows:

a.   That an order be entered certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiffs and their counsel to represent the Class;

b.   That judgment be entered against the Defendants for statutory damages in the amount of not less than $100 and not more than $1,000 per violation per Class member, pursuant to 15 U.S.C. § 1681n(a);

c.   That judgment be entered against the Defendants for punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

d.   That judgement be entered against the Defendants for statutory damages in the amount of not more than $500 per violation per Class member and, in the case of a continuing violation, an amount not to exceed $500 for each subsequent day on which such violation(s) occurred, pursuant to Chapter 109 of the Texas Business and Commerce Code;

e.   That the Court enter a temporary injunction, and on final judgment a permanent injunction, prohibiting the Defendants from publishing criminal record information that has been expunged by a Texas court;

f.   That judgment be entered in favor of Plaintiffs for actual damages related to obtaining the expungement, expunction or sealing of criminal records;

g.  That the Court award costs and reasonable attorney's fees pursuant to 15 U.S.C. §1681n and §1681o; and

h.  That the Court grant such other and further relief as may be just and proper.

By:  ___ s/ David M. Marco _____
Attorney for Plaintiff

Dated: November 23, 2021

David M. Marco
IL Bar No. 6273315/FL Bar No. 125266
SMITHMARCO, P.C.
55 W. Monroe Street, Suite 1200
Chicago, IL 60603
Telephone:  (312) 546-6539
Facsimile:   (888) 418-1277
E-Mail:       dmarco@smithmarco.com