## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT UNDERWOOD, | ) | |
| on behalf of himself and of others | ) | |
| similarly situated, | ) | Case No: 1:21-cv-06299 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Judge Wood |
| v. | ) | Magistrate Judge McShain |
| | ) | |
| TRANSUNION LLC , TRANSUNION | ) | |
| RISK AND ALTERNATIVE | ) | |
| DATASOLUTIONS, INC., AND | ) | |
| DRIVERS HISTORY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

1.    Plaintiff Robert Underwood, individually and on behalf of others similarly situated, brings this class action lawsuit against TransUnion LLC ("TransUnion"), TransUnion Risk and Alternative Data Solutions, Inc., ("TRADS"), and Drivers History, Inc. ("Drivers"). This is a consumer action against TransUnion and two associated entities for selling expunged and sealed criminal records to third parties, including non-FCRA[1] compliant data resellers.[2] These resellers, in turn, made the expunged records available to millions of their own subscribers.

2.    Defendants also sold the same expunged records directly to the public, through various direct-to-consumer search engines and data products they offer at the retail level. The data

---

[1] The Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq. (the "FCRA")

[2] For ease of reference, this Complaint folds criminal records subject to either (1) orders of expungement or (2) orders of non-disclosure (sealing) under the singular label "expunged" as there appears to be no distinction between the types as relates to the merits of any claim in this case. *See, e.g.,* Tex. Bus. & Comm. Code §§ 109.005 (treating them alike for purposes of liability under the statute).

reseller group that published the attached consumer report states that they "partner with" and are "powered by" TransUnion data.

## I.  <u>INTRODUCTORY FACTS</u>

3.     The expunged records of Plaintiff and other class members were licensed to data resellers because of misconduct that emanated from Chicago, Illinois.

4.     Operating out of Chicago, Defendant TransUnion is one of three major consumer reporting agencies in the United States. Its core business is assembling and evaluating consumer credit information for the purpose of preparing and selling consumer reports to third parties.

5.     TransUnion maintains a computer data base called "CRONUS" that contains consumer credit information it uses to generate these reports.

6.     The data base includes the credit activity of every credit-active individual in the United States. TransUnion receives the information from credit grantors such as banks, mortgage companies, credit unions, auto dealers and collection agencies.[3]

7.     The data licensed by Defendants to non-FCRA compliant resellers in this case was CRONUS data, and was gathered, stored, and managed by TransUnion in Chicago.

8.     Likewise, the consumer report at issue in this case was prepared using CRONUS data from TransUnion headquarters in Chicago.

9.     In 2013, TransUnion formed co-Defendant TRADS in connection with the purchase of TransUnion's public-facing search engine, TLOxp.[4] The search engine allows third party subscribers to compile consumer reports directly from TransUnion's CRONUS data.

---

[3] These facts are detailed at greater length in *In re: Trans Union Corp. Privacy Litigation,* 211 F.R.D. 328 (N.D.Ill. 2002) and *Individual Reference Services Group, Inc. v. FTC*, 145 F. Supp.2d 6 (D.D.C. 2001).

[4] These facts are detailed at greater length in *Transunion Risk & Alt. Data Solutions, Inc. v. Best One, Inc. (In re Tlfo, LLC)*, 572 B.R. 391 (Bankr. S.D. Fla. 2016).

10. The data licensed to non-FCRA compliant data resellers in this case was only usable in conjunction with the TLOxp operating system managed and maintained by TransUnion in Chicago.

11. The consumer report at issue in this case was searched for and assembled using the TLOxp operating system managed and maintained by TransUnion in Chicago.

12. In 2014, TransUnion purchased Co-Defendant Drivers History, Inc., the "industry leader in … aggregating criminal related court data."[5]

13. In addition to the insurance industry, Drivers sells criminal data to "employers or potential employers [who] can use these reports to help determine whether someone qualifies, or remains qualified, for a particular job."[6]

14. TransUnion's states that Drivers is subject to the FCRA.[7]

15. The acquisition of Drivers expanded and augmented TransUnion's data base to include criminal records, which resulted in Plaintiff's expunged records becoming part of Defendants' data sales offerings emanating from Chicago.

16. Plaintiff's consumer data and consumer report, like all the products and services provided by TRADS and Drivers, was created, stored, and managed by TransUnion in Chicago.

17. The data in this case that was licensed to non-FCRA compliant resellers was not marketed or sold by TRADS or Drivers from their office locations, but by TransUnion in Chicago.

18. Neither TRADS nor Drivers maintain public-facing business platforms or online store-fronts independent from TransUnion.

---

[5] https://newsroom.transunion.com/transunion-enhances-solutions-for-the-insurance-industry-with-majority-ownership-of-drivers-history/
[6] https://www.drivershistory.com/support/fcra-disclosure-statement
[7] Id.

19.     Neither TRADS nor Drivers independently sell or market data reseller licenses or any other product or service.

20.     TRADS and Drivers' products and services are only available for sale or license through TransUnion's website, which is operated, and controlled by Trans Union from its headquarters located in Chicago.

21.     On TransUnion's website, all TRADS and Drivers products and services are clearly described, labeled, marketed, and trademarked as TransUnion products and services. From this, customers and regulators can correctly conclude that TransUnion creates, maintains, manages, and controls what is being bought and sold as TransUnion goods and services.

22.     TRADS and Drivers do not control the terms of sale or use of data licensed to non-FCRA compliant data resellers.  TransUnion, in Chicago, sets the terms of sale and use.[8]

23.     TransUnion's website states that its control of TRADS and Drivers includes unilaterally "eliminating or discontinuing any services [or] products" offered by either associated entity, "restricting the hours of availability or limiting the amount of use permitted" for customers of either entity, and forcing those customers (and more broadly anyone who simply "uses" or "accesses" the TransUnion website) to litigate any disputes with Defendants in "the state and federal courts located in Cook County, Illinois, USA."[9]

24.     All the activity in this case that harmed Plaintiff and the proposed class occurred in Chicago.  Chicago, therefore, is the key locus of activity and control when considering venue, jurisdiction, and liability for violations of the following:

- The Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq. (the "FCRA");

---

[8] All TRADS and Drivers customers must agree to TransUnion's Terms of Use: https://www.transunion.com/legal/terms-of-use
[9] Id.

- The Texas Expungement Removal Act, Tex. Bus. & Comm. and Code §§ 109.001–.007; and

- The Texas Deceptive Trade Practices Act (the "DTPA"), §17.41 of the Tex. Bus. & Comm. Code;

25.     For his part, Plaintiff in this case comes from a group[10] of former subscribers of an online expungement assistance service, Easy Expunctions.

26.     The expunged records of these subscribers still appeared for sale on data reseller websites linked to Defendants, from one to two years after notices were provided demanding their immediate removal.

27.     In each case, the provided notice included a court order of removal, which was not followed.

28.     In each case, Defendants supplied data containing the expunged records.

29.     This group of Easy Expunctions' past subscribers, including Plaintiff, are all from Texas, which is why two Texas-based consumer claims are raised in addition to the FCRA.

30.     Having licensed or sold these expunged records, Defendants knew or should have known that violations by their data reseller customers were occurring and intervened to end the injurious conduct pursuant to Defendants' rights and duties as licensors and vendors to do so. [11]

31.     Drivers received legal notice to remove Plaintiff's expunged records from: (i) Plaintiff's expungement service provider; (ii) from the Texas Department of Public Safety; and/or (iii) from their own licensees and clients.

---

[10] Undersigned counsel has represented or currently represents multiple other potential class representatives or members, all of whom are former clients of Easy Expunctions. That one expungement service provider would encounter so many cases of these Defendants ignoring court ordered expungements is shocking and suggests that the size of this class will be large.

[11] Defendants' standard licensing agreement contains a right to audit data resellers and terminate the license for misuse. See https://www.tloxp.com/terms-conditions

32.     Upon receiving legal notice to remove Plaintiff's expunged records, Drivers was obligated to communicate said legal notice to its associated entities, TransUnion and TRADS to ensure that TransUnion and TRADS did not prepare, publish, or otherwise make available for publication, information that included Plaintiff's expunged record.

33.     TransUnion knew, or should have known, that its database contained information that included Plaintiff's expunged record.

34.     TransUnion knew, or should have known, that it needed to remove from its database information that included Plaintiff's expunged record.

35.     TRADS knew, or should have known, that its database contained information that included Plaintiff's expunged record.

36.     TRADS knew, or should have known, that it needed to remove from its database information that included Plaintiff's expunged record.

37.     Accordingly, Plaintiff brings this action on behalf of all Texas consumers, and all consumers of other states, who had their expunged or sealed records sold and/or licensed by Defendants. Upon ascertaining the states of residence for such consumers, this Complaint will be amended to add applicable consumer protection and expungement laws existing  in these other jurisdictions, as well.

## II.     JURISDICTION AND VENUE

38.     This Court has subject-matter jurisdiction under 15 U.S.C. § 1681p, which allows any FCRA claim to "be brought in any appropriate United States district court, without regard to the amount in controversy.…" Plaintiff is bringing claims under the FCRA in this case.

39.     This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331, which gives federal district courts original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

40.     This Court also has subject-matter jurisdiction under 28 U.S.C. § 1367 for supplemental state-law claims. Plaintiff is bringing supplemental Texas statutory claims under TEX. BUS. & COM. CODE ANN. §§ 109.001–.007 and the Texas DTPA.

41.     This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332(a) as there is complete diversity between the parties and the matter in controversy is more than $75,000. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2) because this is a class action case where the matter in controversy, exclusive of interest and costs, exceeds $5 million and a member of a class of plaintiffs is a citizen of a state different from any defendant.

42.     Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because TransUnion's headquarters are in this District and it is where a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, namely TransUnion's database.

43.     This Court has personal jurisdiction over Defendants because each Defendant has transacted business, maintained substantial contacts, and committed acts in furtherance of their enterprise in this District. [12] This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Illinois.

44.     Finally, jurisdiction and venue in this Court were contractually agreed to by Defendants in their own Terms of Use provision, which states:

---

[12] *Markarian v. Garoogian,* 767 F. Supp 173 (N.D.Ill 1991)

"Please read the following information carefully before **using** this Site or **accessing** any materials provided herein. By **using** this Site, you represent that you have read these Terms of Use (these "Terms") and our Privacy Policy and any other terms posted by TransUnion, that you understand their terms, and that you agree and intend to be legally bound by them. You acknowledge that in providing you **access to** and **use of** the Site we are relying on your agreement to be bound by these Terms."[13] (Emphasis added).

45.     Plaintiff and/or his agents have "used" and "accessed" Defendants' website, as described by TransUnion. Therefore, per their own Terms of Use, Defendants have agreed that "any and all disputes arising under this Agreement or out of our provision of services to you, if submitted to a court of law, shall be submitted to the state and federal courts located in Cook County, Illinois, USA."[14]

### III. <u>PARTIES</u>

46.     Plaintiff Robert Underwood is an adult individual and citizen of the State of Texas, who resides in Burleson, Texas.

47.     Defendant TransUnion LLC is a Delaware corporation with its principal place of business and headquarters located in Chicago, Illinois. Defendant is a consumer reporting agency as that term is defined by the FCRA, 15 U.S.C. § 1681a(f). Defendant regularly conduct business in the State of Illinois, and it operates its principal place of business at 555 West Adams, Chicago, Illinois 60661.

48.     Defendant TransUnion Risk and Alternative Data Solutions, Inc., is a Delaware corporation that licenses and/or sells consumer data. Defendant regularly conducts business in the State of Illinois, but purportedly operates a principal place of business at 4530 Conference Way South, Boca Raton, Florida 33431.

---

[13] https://www.transunion.com/legal/terms-of-use
[14] Id.

49. Defendant Drivers History, Inc., is a Delaware company that licenses and/or sells consumer data. Defendant regularly conducts business in the State of Illinois but purportedly operates a principal place of business at 1 Keystone Ave, Unit 700, Cherry Hills, New Jersey 08003.

## IV. FURTHER BACKGROUND

50. Nearly all 50 states have expanded their expungement laws in the last decade. The proliferation of background check companies, numbering in the hundreds and all charging subscription or access fees, creates insurmountable logistical and financial obstacles to anyone wanting to insure his or her expunged criminal record was properly removed.

51. Congress enacted the FCRA's "maximum possible accuracy" requirements to protect consumers from exactly what happened to Plaintiff and the proposed class here.[15]

52. Yet, TransUnion offers a suite of "non-FCRA alternative data options" which it markets as "an aggregated, networked view of public and private non-FCRA regulated information."[16]

53. TransUnion supplies non-FCRA compliant data resellers, with non-FCRA compliant data, through TRADS, as does Drivers. On its website, TransUnion claims that the FCRA does not apply to TRADS because TRADS, purportedly, does not supply data for use in employment, loan, rental, or insurance screenings.

54. As the entire point of dealing in non-FCRA compliant data is to trade accuracy for profit, most of these non-FCRA compliant sites produce consumer reports rife with errors, such as including criminal data for unrelated third parties and sex offenders, as happened in Plaintiff's case

---

[15] 115 Cong. Rec. 2410, 2411 (1969).
[16] https://www.transunion.com/product/alternative-data

55.     Including criminal records of people with similar names to Plaintiff also likely resulted in Plaintiff's expunged record appearing in innumerable reports prepared pertaining to other consumers with names resembling his own, i.e., Robert Underwood.

56.     The reseller group at issue here had such pervasive problems with TransUnion failing to remove expunged records that they put a *disclaimer* about it in their Terms of Service: "[T]he criminal record data that may be provided as part of the Company's Background Information Services may include records that have been **expunged, sealed, or otherwise have become inaccessible to the public**".

57.     *Plaintiff's expungement experience.*  For approximately $600, Plaintiff hired Easy Expunctions, to guide him through the expungement process.  He also paid several hundred dollars in court costs, fees, and related expenses to successfully expunge his records and received an expungement order from a state court.

58.     Plaintiff then paid an additional $250 for Easy Expunctions to notify the universe of credit bureaus, background check companies and data resellers, that they must remove Plaintiff's expunged record from their databases.

59.     Plaintiff's understanding was that Defendants and other recipients of his expungement order then would cease publishing and selling his expunged record. As footnoted earlier, there are several other past Easy Expunctions subscribers that did the exact same thing and still wound up in the Plaintiff's unfortunate position.

60.     The Texas Department of Public Safety received Plaintiff's expungement order from the court and notified its subscribers to remove the record.

61.     Texas DPS records show that the Defendants were one of those subscribers and received proper notice from Texas DPS that Plaintiff's criminal record had been expunged.  For

example, Drivers (as "Drivers History Information") appears as a purchaser of Texas DPS criminal

and expungement records on the state agency website:



And Easy Expunctions confirms that, as a subscriber to the Texas DPS database service, it received

timely notice of Plaintiff's expungement.

62.     Plaintiff, like other members of the proposed class, did not just seek an

expungement order when hiring Easy Expunctions; rather he sought Defendants' removal of his

criminal record, without which the actual order is merely a meaningless piece of paper.

63.     Plaintiff is not knowledgeable about the consumer data industry and has no idea how or to whom Defendants sell his consumer reports.  He is reliant on representations made by Defendants and the consumer data industry to the public, to courts, and to regulators, that expunged records will be removed. When those representations and/or fraudulent omissions understandably became part of Easy Expunctions' own sales and marketing campaign, Plaintiff believed them.

64.     TransUnion's website falsely states that Defendants "limit access to TransUnion's consumer credit database and make it available only to the following:

- Entities with a permissible purpose to receive it, as defined in the Fair Credit Reporting Act ("FCRA");

- Entities with a permitted use under Title V of the Gramm-Leach-Bliley Act;

- Companies who resell our data as permitted under law"

65.     Furthermore, Plaintiff was entitled to, but failed to receive, GLBA notice and opt-out rights when Defendants sold his expunged record to non-FCRA compliant data resellers.

66.     *Defendants are Consumer Reporting Agencies*.  Defendants, TransUnion and Drivers, are consumer reporting agencies as defined by FCRA as acknowledged by both on their website.  Though TransUnion claims TRADS products are not governed by the FCRA, TRADS retail-level customers are precisely those industries that fall squarely within the ambit of the FCRA:



Given its retail sales targets, and inherent lack of know-your-customer controls in wholesaling data to the non-FCRA compliant reseller industry, it is not surprising that Plaintiff's expunged record— and those of many others[17]— were included in consumer reports such as the one attached hereto. Hence, given its conduct in this matter, TRADS is a consumer reporting agency for purposes of this case.

67.    *The Texas Expungement Statute.*    In Texas, when an order of expunction is final, "the release, maintenance, dissemination, or use of the expunged records for any purpose is prohibited," and "the person arrested may deny the occurrence of the arrest and the existence of the expunction order." Tex. Code Crim. Proc. art. 55.03.[18] Accordingly, Chapter 109 of the Texas

---

[17] Similar consumer reports, compiled with Defendants' data and containing expunged records, exist for seventeen (17) other past clients of Easy Expunctions.
[18] Similar provisions exist in Texas for sealed criminal records, as well. Tex. Gov. Code §411.0755.

Business and Commerce Code ("the Texas Expungement Statute") provides private parties with statutory damages claims against any business that publishes expunged records. Tex. Bus. & Comm. Code §§ 109.001–.007.

68.     Plaintiff's expunged record was published by Defendants to various third parties. Defendants provided licenses to data resellers to access their database for sale to the general public, which ultimately occurred.

69.     Under the Texas Expungement Statute, a publisher must charge "a fee or other consideration to correct or modify criminal record information." Tex. Bus. & Comm. Code § 109.002(a)(1).

70.     The data resellers at issue here paid a monthly licensing fee to Defendants in excess of the statutory minimum for corrected, modified, and updated data—including criminal record information.

71.     Plaintiff and other potential class members could not complete even the first step of modifying or criminal record information—i.e., discovering that it was being published and needed correcting—without buying a subscription from Defendants in excess of the statutory minimum amount.

## V.      CLASS ACTION ALLEGATIONS

72.     Pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and "the Class," defined as:

> ***All persons residing in the United States whose expunged or sealed criminal records were licensed or sold by Defendants.***

73.     This Class is so numerous that joinder of all members is impracticable. Although the precise number of Class members is known only to the Defendants, the facts suggest that the Class numbers in the thousands, at a minimum. Through interstate  commerce, Defendants publish

and sell standardized criminal history record information to thousands of individuals and businesses throughout the country.

74.     There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members. The principal questions include (a) whether the Defendants, by employing a policy, scheme, and practice of publishing and disclosing expunged criminal records, willfully and negligently violated FCRA section 1681e(b) by  failing to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates; (b) whether the Defendants violated Chapter 109 of the Texas Business and Commerce Code for the same reasons; (c) whether Defendants violated the Texas DTPA for the same reasons and based upon unmet GLBA obligations, (d) whether Defendants were unjustly enriched by the above misconduct; and, (e) whether a conspiracy existed to for the same.

75.     Plaintiff's claims are typical of the claims of each Class, which all arise from the same operative facts and are based on the same legal theories.

76.     Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is committed to vigorously litigating this matter. Plaintiff has secured counsel experienced in handling consumer class actions. Neither Plaintiff nor counsel have any interests which might cause them not to vigorously pursue this claim.

77.     This action should be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members which would establish incompatible standards of conduct for the parties opposing the Class, as well as a risk of adjudications with respect to individual members which would as a practical matter be dispositive of the interests of other

members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

78.     A class action is a superior method for the fair and efficient adjudication of this controversy. The interest of Class members in individually controlling the prosecution of separate claims against Defendants is small as each cause of action is subject to a statutory damages cap and  there is no reason to award different amounts per day among the Plaintiff or potential class members of those statutory damages that accrue daily. Management of the Class claims is likely to present significantly fewer  difficulties than those presented in many individual claims. The identities of the Class members may be obtained from the Defendants' records or those of their clients and co-conspirators, to which Defendants have access.

## VI.     CAUSES OF ACTION

### COUNT ONE – FCRA § 1681e(b)

79.     Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

80.     Pursuant to the FCRA, 15 U.S.C. § 1681e(b), when preparing consumer reports, Defendants were obligated to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom a consumer report relates.

81.     In compiling consumer reports and providing licenses for third parties to generate consumer reports based on Defendants' data, Defendants sold consumer reports that contained inaccurate information, such as the inclusion of expunged criminal records.

82.     Pursuant to sections 1681(n) and 1681(o), Defendants are liable for negligently and/or willfully violating the FCRA by failing to follow reasonable procedures to assure maximum

possible accuracy of the information concerning the individual about whom a consumer report relates, in violation of section 1681(e)(b).

83.     Defendants' refusal and failure to remove Mr. Underwood's expunged records from the data it sold to various third parties, both known and unknown, has caused Plaintiff tremendous stress, anxiety, frustration, and worry for Mr. Underwood, resulting in loss of sleep, feelings of depression, loss of appetite, and moodiness, which has negatively impacted his personal and professional life and relations.

84.     In addition, Defendant's failure to remove Mr. Underwood's expunged records from the data it sold to various third parties, both known and unknown, has impeded Mr. Underwood's ability to secure employment.

85.     As a result of Defendants' conduct Plaintiff suffered further actual damages in the form of out-of-pocket loss in the funds paid to complete the expungement, expunction, or sealing of criminal records process only to have Defendants continue to report obsolete and impermissible criminal information about him. Plaintiff likewise paid and must pay his attorneys a significant percentage of damages on any recovery made in litigating this entire matter.

86.     Plaintiff seeks actual, statutory, and punitive damages in addition to costs and attorneys' fees pursuant to 15 U.S.C. §1681(n).

## COUNT TWO – TEX. BUS. & COM. CODE §§ 109.001–.007

87.　　Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

88.　　Pursuant to sections 109.001—.007, each of the Defendants are directly liable for failing to remove Plaintiff's expunged criminal records and consumer reports from their own database and from being published or sold by their clients after being provided notice of expungement.

89.　　Plaintiff is entitled to a penalty of up to $500 for each separate violation. Each of the Defendants have engaged, and are engaging, in a continuing violation, so a separate penalty of up to $500 per violation is owed for each day on which the violation occurred. Tex. Bus. & Comm. Code § 109.005(b). If Defendants are ultimately treated as separate entities, they each would be separately liable for this amount.

90.　　Plaintiff is entitled to attorneys' fees and costs related to claims for penalties under Texas Business and Commerce Code Chapter 109. Tex. Bus. & Comm. Code § 109.005(d).

## COUNT THREE – TEXAS DTPA

91.　　Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

92.　　Defendants have violated the Texas Deceptive Trade Practices—Consumer Protection Act ("DTPA") as contained in Section 17.41 of the Tex. Bus. & Comm. Code, and Plaintiffs seek to recover treble damages, attorney's fees, and court costs under the DTPA.

93.　　Plaintiff was a "consumer" under the DTPA. Plaintiff purchased expungement services and an expungement. These services form a basis of Plaintiff's complaint and Defendants' misconduct occurred  in connection with this transaction.

94. The conduct, as detailed in this Complaint, constituted "false, misleading, or deceptive" acts, practices, omissions and/or "unconscionable conduct." Each such act, practice, omission, and unconscionable conduct was a producing cause of economic damages and mental anguish damages for Plaintiff.

95. The Texas DTPA defines an "unconscionable action" as one that "takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree." *See* Definitions §17.45(5). Defendants' sale of and failure to remove Plaintiff's expunged records occurred without Plaintiff knowing that Defendants and their clients were selling Plaintiff's personal records, without Plaintiff being able to view relevant reporting products, and without Plaintiff knowing either how Defendants acquired his records or to whom they were sold. Far from being an arm's-length relationship, Plaintiff was completely in the dark and powerless to stop what occurred, thus meeting the unconscionability standard of the Texas DTPA. Furthermore, for the reasons described earlier in this Complaint, Defendants' violations of the GLBA constitute "unconscionable" conduct under the Texas DTPA.

96. Texas DTPA § 17.46(b) (colloquially known as the DTPA "laundry list") defines a "deceptive act or practice" to include the following actions that occurred in this case:

- Defendants caused confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

- Defendants represented that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not;

- Defendants represented that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

- Defendants represented that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

- Defendants failed to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

97.     Not only did Defendants' sale of Plaintiff's expunged records, and subsequent failure to remove them from their clients' websites violate these "laundry list" provisions, but so too did their violations of the GLBA.

98.     Finally, Defendants concealed and omitted consumers' rights under the GLBA from their explanations of other consumer rights and remedies that appeared in sections of their website.

99.     As all the aforementioned misconduct was committed knowingly or intentionally, Plaintiff is entitled to recover up to three times the amount of the aforementioned economic and mental anguish damages.

100.     Plaintiff is also entitled to recover reasonable and necessary attorney's fees and court cost under the DTPA.

## VI.  **JURY DEMAND**

101.     Plaintiff demands trial by jury on all issues so triable.

## VII.      **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks relief against the Defendants as follows:

a. That an order be entered certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to represent the Class;

b. That judgment be entered against the Defendants for statutory damages in the amount of not less than $100 and not more than $1,000 per violation per Class member, pursuant to 15 U.S.C. § 1681n(a);

c. That judgment be entered against the Defendants for punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

d. That judgement be entered against the Defendants for statutory damages in the amount of not more than $500 per violation per Class member and, in the case of a continuing violation, an amount not to exceed $500 for each subsequent day on which such violation(s) occurred, pursuant to Chapter 109 of the Texas Business and Commerce Code;

e. That the Court enter a temporary injunction, and on final judgment a permanent injunction, prohibiting the Defendants from publishing criminal record information that has been expunged by a Texas court;

f. That judgment be entered in favor of Plaintiff for actual damages related to obtaining the expungement, expunction or sealing of criminal records;

g. That the Court award costs and reasonable attorney's fees pursuant to 15 U.S.C. §1681n and §1681o; and

h. That the Court grant such other and further relief as may be just and proper.

Respectfully submitted,
**ROBERT UNDERWOOD,**
**on behalf of himself and of**
**others similarly situated**

By: ___ *s/ Tommy J. Lyons* _____
Thomas J. Lyons Jr., Esq.
MN Attorney I.D. #:  0249646
CONSUMER JUSTICE CENTER P.A.
367 Commerce Court
Vadnais Heights, MN  55127
Telephone:      (651) 770-9707
Facsimile:      (651) 704-0907
Email:          tommy@consumerjusticecenter.com
*Admitted Pro Hac Vice*

David M. Marco
IL Bar No. 6273315/FL Bar No. 125266
SMITHMARCO, P.C.
55 W. Monroe Street, Suite 1200
Chicago, IL 60603
Telephone:      (312) 546-6539
Facsimile:      (888) 418-1277
E-Mail          dmarco@smithmarco.com